**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Scott Kenton,

        Plaintiff,

vs.

Linda Foster,

        Defendant.

No. CV-04-2005-PCT-PGR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Having held a bench trial in this matter, the Court enters its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT[1]

1. Plaintiff Scott Kenton ("Mr. Kenton") was a citizen of California for purposes of 28 U.S.C. § 1332 at the time this action was commenced on September 24, 2004.

2. Defendant Linda Foster ("Ms. Foster") was a citizen of Arizona for purposes of 28 U.S.C. § 1332 at the time this action was commenced.

3. The Complaint's sole claim alleges the breach of a contract of sale of a

---

[1]

        To the extent that any of the Court's findings of fact constitute conclusions of law or the application of law to the facts, they are incorporated as conclusions of law.

residence located at 2081 Bryce Circle, Lake Havasu City, Arizona 86406 ("the property") owned by Ms. Foster.  The property's legal description in the records of the Mohave County Assessor is Lots 3 and 4, Block 4, Tract 2244; Township 13N, Range 20W, Section 23.  The assessor's parcel number for the property is 109-21-065A.

4.  Ms. Foster acquired the property in 1996. (Ms. Foster's testimony.)  Ms. Foster owned the property on July 20, 2004, and continued to be the sole owner of the property at the time of the bench trial. (Ms. Foster's testimony; parties' stipulation.)

5.  The property was appraised for $312,000 in 2000. (Parties' stipulation; Exhibit 26; Ms. Foster's testimony.)

6.  Ms. Foster listed the property for sale with Joanna and Associates Realty on March 2, 2004; the listing price was $575,0000. (Exhibit 26; Ms. Foster's testimony.)

7.  No one looking at the property at that time with realtor Joanna Pellaterio would offer anything over $225,000 or $250,000 because the city sewer to the property had backed up and ruined the downstairs of the property and the smell of the sewer was still present. (Ms. Foster's testimony.)

8.  There had been a fire at the property in 2003. (Ms. Foster's testimony.)

9.  Mr. Kenton first met Ms. Foster over the Fourth of July weekend, 2004, in Lake Havasu City, Arizona. (Mr. Kenton's testimony.)

10.  During that Fourth of July weekend, Mr. Kenton met Ms. Foster at the property, which at that time was empty as Ms. Foster was living at her parents' house, it had no electricity, no running water, no telephone service, and no trash pickup.  (Parties' testimony.)

1
2
3

     11.  Ms. Foster was not working at that time, and she informed Mr. Kenton that she had no money and that the property was going into foreclosure in twenty days. (Parties' testimony.)

4
5
6
7
8

     12.  Mr. Kenton expressed an interest at that time in buying the property for $250,000.  He was aware when he made the offer that it was below the fair market value of the property. (Mr. Kenton's testimony.)  Ms. Foster also understood at that time that the offered price was below the property's fair market value, which she then believed was at least $350,000. (Ms. Foster's testimony.)

9
10
11
12
13
14
15
16

     13.  Sometime prior to July 20, 2004, Mr. Kenton and Ms. Foster orally discussed a proposal whereby Mr. Kenton would purchase the property for $250,000, plus provide her a place to live for the earlier of seven years or until she received her next installment from the California lottery.  (Parties' testimony.) Mr. Kenton hand-wrote on a piece of paper, sometime prior to July 20, 2004: "250,000 + place to live til next check from Cal. Lotto is recieved [sic]/ not to exceed 7 years[.]" (Exhibit 40; parties' testimony.) The note was not signed or dated. (Exhibit 40.)

17
18
19

     14.  Mr. Kenton started to fill out a form real estate sale contract on July 14, 2004; the form was never completed and was never signed by either party. (Exhibit 21; Mr. Kenton's testimony.)

20
21
22
23
24

     15.  Mr. Kenton and Ms. Foster met with an attorney, Harvey Jackson, on July 12, 2004, in order to discuss their proposal that as a part of the sale of the property Mr. Kenton would provide Ms. Foster a place to live for seven years or until she got her next lottery payment; they did not have the attorney draft any contract for the sale of the property. (Parties' testimony.)

25
26

     16.  Mr. Kenton make a series of payments totaling of $1,823.71 to Ms.

Foster as a down payment on the property; the payments, which included the payment of various bills owed by Ms. Foster, commenced on July 14, 2004 and continued intermittently through October 25, 2004. (Exhibits 2 and 19; parties' stipulation.)  Mr. Kenton would not have made the payments if he was not going to purchase the property. (Mr. Kenton's testimony.)

17.  Mr. Kenton and Ms. Foster selected Chicago Title Insurance Company in Lake Havasu City, Arizona as their escrow agent and it prepared escrow instructions in accordance with their instructions. (Parties' stipulation.)  Mr. Kenton and Ms. Foster signed escrow instructions at the Chicago Title Insurance Company office on July 20, 2004; the escrow number was 00920522-KGL and the escrow officer was Chatty Larson. (Exhibit 3; parties' testimony.)

18.  The escrow instructions stated in part in paragraph 32 that "[t]he Seller and Buyer, respectively, under the above numbered escrow, hereby certify that the executed escrow instructions form the only binding agreement between said parties, as no formal written or oral purchase agreements have been entered into between the parties." (Exhibit 3.)  This paragraph of the escrow instructions was highlighted in yellow in the copy of the instructions that Chatty Larson gave to each party and discussed with the parties on July 20, 2004. (Exhibit 24; Mr. Kenton's testimony.)

19.  The escrow instructions provided in part that the sales price to be paid by Mr. Kenton was $250,000, that there was no earnest money, that Mr. Kenton was to deposit $50,000 in cash on or before the close of escrow, and that the parties were to comply with the terms and conditions of the escrow instructions on or before September 9, 2004. (Exhibit 3; Mr. Kenton's testimony.)

20.  The escrow instructions did not provide for the payment of any broker's

- 4 -

1   commission. (Exhibit 3.)

2      21.  The escrow instructions provided in part in paragraph 34 that "[y]ou

3   have entered into this transaction without engaging the services of a real estate

4   broker or an attorney to assist you.  This means that it will be your responsibility

5   to make sure that you comply with all legal rules that govern the transfer of real

6   property.  In addition, you should know that once you sign legally binding

7   documents, such as escrow instructions, the property could be tied up in legal

8   action. ... As the escrow holder, we are not able to provide you with any advice to

9   help comply with the legal rules that govern the transfer of real property.  If you

10  have any questions concerning the legal rules, or do not know what they are, we

11  urge you to seek the advice of an attorney and a real estate broker." (Exhibit 3).

12  This paragraph of the escrow instructions was highlighted in yellow in the copy of

13  the instructions that Chatty Larson gave to each party and discussed with the

14  parties on July 20, 2004. (Exhibit 24; Mr. Kenton's testimony.)

15     22.  Ms. Foster signed a warranty deed conveying the property to Mr.

16  Kenton on July 20, 2004. (Exhibit 5; Ms. Foster's testimony.)

17     23.  Mr. Kenton and Ms. Foster signed an addendum to the escrow

18  instructions on July 20, 2004; the addendum acknowledged that Mr. Kenton had

19  been disbursing funds to Ms. Foster prior to the close of escrow and that those

20  receipted funds would be deducted from Ms. Foster's proceeds at the close of

21  escrow. (Exhibit 18; parties' testimony.)

22     24.  Ms. Foster went to the Chicago Tile Insurance Company office on July

23  30, 2004 to cancel the escrow.  Ms. Foster signed a Cancellation and Statement

24  of Breach form on that date wherein she stated that the breach of the contract

25  was Mr. Kenton's failure to deposit any earnest deposit.  Escrow officer Chatty

26

- 5 -

1    Larson mailed a Mutual Cancellation Instructions form to Mr. Kenton for his

2    signature; the form had already been signed by Ms. Foster.  (Exhibits 16 and 17;

3    Ms. Foster's testimony.)

4         25.   Ms. Foster signed a contract to sell the property for $380,000 to

5    realtor Maureen Sieker of Selman and Associates on July 31, 2004. (Exhibit 8;

6    Ms. Foster's testimony; parties' stipulation.)

7         26.   Mr. Kenton first heard about Ms. Foster's cancellation attempt through

8    a telephone call.  Mr. Kenton did not agree to the cancellation and did not sign

9    the mutual cancellation form that Ms. Larson had mailed to him.  On August 30,

10   2004, at Mr. Kenton's request, Chicago Title Insurance Company office manager

11   Noreen Kverner stamped "void" on the Cancellation and Statement of Breach

12   form signed by Ms. Foster. (Mr. Kenton's testimony; Exhibit 15.)

13        27.   At the time of Ms. Foster's attempted cancellation on July 30, 2004,

14   Mr. Kenton had no knowledge of any earnest money requirement.  He did not

15   sign the copy of the escrow instructions (Exhibit 4) that showed an earnest

16   money requirement of $5,000. (Mr. Kenton's testimony.)

17        28.   Ms. Foster does not recall signing a second form of escrow

18   instructions on July 20, 2004, and she does not know why the two forms of

19   escrow instructions (Exhibits 3 and 4) are different. (Ms. Foster's testimony.)

20        29.   The two forms of escrow instructions (Exhibits 3 and 4) differ only as to

21   their first pages; the parties' signatures on both forms are identical.

22        30.   Mr. Kenton paid $427 for an appraisal of the property on August 6,

23   2004.  (Mr. Kenton's testimony; Exhibit 14.)

24        31.   Mr. Kenton obtained a $200,000 loan commitment from Wells Fargo

25   Home Mortgage prior to September 9, 2004, the close of escrow date. (Mr.

26

Kenton's testimony; Exhibits 1 and 13.)

32.  Mr. Kenton gave Chicago Title Insurance Company a cashier's check for $50,000.00 on September 7, 2004. (Exhibit 12; Mr. Kenton's testimony.)

33. Mr. Kenton paid Chicago Title Insurance Company closing funds of $3,703.44 on September 9, 2004. (Exhibit 20.)

34. Ms. Foster sent a letter, dated September 9, 2004, to both Mr. Kenton and Chicago Title Insurance Company that stated that she was rescinding her agreement to sell the property to Mr. Kenton due to "undue influence, duress and fraud."  (Exhibit 6.)

35.  A quitclaim deed for the property, dated June 2, 2004, stated in its first paragraph that it was between Ms. Foster and Douglas Vern Huntley, and in its second paragraph stated that its purpose was to transfer all of Don R. Van Pelt's interest in the property, if any, to Mr. Huntley.  (Exhibit 10.)  Mr. Van Pelt signed the quitclaim deed on June 2, 2004 and Ms. Foster signed the quitclaim deed on September 7, 2004. (Exhibit 10.)  Ms. Foster took the quitclaim deed to the Mohave County's Recorder to have it recorded for her father, Mr. Huntley; she was not supposed to sign the quitclaim deed and only did so because a county employee told her she had to sign it.  (Ms. Foster's testimony.)  Ms. Foster did not receive any compensation for signing the quitclaim deed. (Ms. Foster's testimony.)

36.  Mr. Van Pelt is Ms. Foster's boyfriend. (Ms. Foster's testimony.)  He advanced money to Ms. Foster to help make payments on the property both prior to and after July, 2004. (Ms. Foster's testimony.)

37.  Mr. Van Pelt, acting on a power of attorney given to him by Ms. Foster, signed the quitclaim deed (Exhibit 10) to Mr. Huntley because Mr. Huntley had

1   loaned him money to get the property out of foreclosure and to pay back taxes on
2   the property. (Mr. Van Pelt's testimony.)  Mr. Van Pelt had no recorded, or
3   recordable, interest in the property prior to June 2, 2004. (Mr. Van Pelt's
4   testimony.)

5        38.  Another quitclaim deed to the property, dated January 20, 2004,
6   between Douglas V. Huntley and Donald Robert Van Pelt stated that it
7   transferred all of Mr. Huntley's interest in the property, if any, to Mr. Van Pelt.
8   (Exhibit 11.)  The quitclaim deed was signed by Mr. Huntley on January 20, 2005,
9   and was recorded by Mr. Van Pelt with the Mohave County Recorder on January
10  21, 2005. (Exhibit 11; Mr. Van Pelt's testimony.)

11       39.  The second quitclaim deed (Exhibit 11) was executed after Mr. Van
12  Pelt repaid Mr. Huntley the money he had borrowed from him; it was executed
13  based on an oral agreement between the two of them that Mr. Huntley would
14  quitclaim the property back to Mr. Van Pelt when the loan was repaid. (Mr. Van
15  Pelt's testimony.)

16       40.  Ms. Foster's original counsel recorded a Lis Pendens Notice regarding
17  the property with the Mohave County Recorder on November 3, 2004. (Exhibit
18  23.)  The Lis Pendens Notice states the wrong date for the commencement of
19  this action, states the wrong street address for the property, states the wrong
20  tract number for the property, and wrongly states that the purpose of this action is
21  to confirm title to, remove clouds from title, and to force the defendants to convey
22  title to a mineral interest.

23       41.  Mr. Kenton filed a Notice of Election of Remedies (doc. #64) on March
24  29, 2007, wherein he states that he elects specific performance as his remedy in
25  this action, unless the Court ultimately decides that specific performance cannot

26

1  be ordered, in which case he elects damages as his remedy.

2      42.  The Court dismissed Ms. Foster's two counterclaims in an Opinion and

3  Order (doc. #44), entered on September 14, 2006.

4  II. CONCLUSIONS OF LAW[2]

5      1.  The Court has diversity of citizenship jurisdiction over this action

6  pursuant to 28 U.S.C. § 1332.

7      2.  Venue is appropriate in the District of Arizona pursuant to 28 U.S.C.

8  § 1391(a).

9      3.  Arizona's substantive law applies to this action.

10      4.  Ms. Foster was the sole owner of the property on July 20, 2004, and

11  remained the sole owner of the property as of the date of the trial of this action.

12  The quitclaim deeds (Exhibits 10 and 11) did not convey any legal interest in the

13  property as Mr. Van Pelt never had any legal interest in the property to convey to

14  Mr. Huntley on June 2, 2004, Ms. Foster did not intend to convey her legal

15  interest in the property on June 2, 2004 and did not do so, and Mr. Van Pelt did

16  not obtain any legal interest in the property on January 20, 2005 as Mr. Huntley

17  had no legal interest in the property to convey to him.  The purpose of the first

18  quitclaim deed was in effect to secure a debt owed by Mr. Van Pelt to Mr.

19  Huntley, and the purpose of the second quitclaim deed was in effect to show a

20  satisfaction and release of that debt upon its repayment; no actual transfer of

21  legal title was intended by the signatories to the quitclaim deeds.

22      5.  Although the Lis Pendens Notice relied upon by Mr. Kenton is most

23  likely of no legal value under A.R.S. § 12-1191(A) given the significant

24  _____

[2]

25      To the extent that any of the Court's conclusions of law constitute
26  findings of fact, they are incorporated as findings of fact.

- 9 -

informational errors contained in it, that is not an issue that the Court needs to decide at this point since the second quitclaim deed, which was recorded after the Lis Pendens Notice was recorded, failed as a matter of law to convey any legal interest in the property to Mr. Van Pelt.

6. The parties entered into a valid and binding written contract for the sale of the property on July 20, 2004.

7. The parties' contract is that set forth in the escrow instructions submitted as Exhibit 3. Signed escrow instructions that identify the parties, give a legal description of the property being sold, state the purchase price, and provide a closing date for the escrow, all of which the instructions set forth in Exhibit 3 did, are sufficient to constitute a contract for the sale of real property for purposes of the statute of frauds. S*ee* T.D. Dennis Builder, Inc. v. Goff, 418 P.2d 367, 369-70 (Ariz.1966); *see also*, Daley v. Earven, 639 P.2d 372, 375 (Ariz.App.1981) (Signed escrow instructions are properly considered in determining whether a land sale agreement exists); Richards v. Simpson, 531 P.2d 538, 540 (Ariz.1975) ("Escrow instructions may serve to comply with the statute of frauds.")

8. While the parties orally discussed a proposal prior to July 20, 2004 whereby Mr. Kenton, as part of his purchase of the property, would provide Ms. Foster with a place to live for seven years or until she received her next California lottery payment, as set forth in Exhibit 40, the parties never entered into a written contract to that effect sufficient to comply with the statute of frauds. *See* A.R.S. § 44-101(6) (Any agreement for the sale of real property requires that the agreement, or some memorandum thereof, be in writing and signed by the party to be charged.) Furthermore, any such agreement was superceded by the parties' escrow instructions (Exhibit 3), signed on July 20, 2004, as those

- 10 -

instructions, as amended, constituted the parties' full and final agreement for the sale of the property.

9.  The parties' contract (Exhibit 3) did not require Mr. Kenton to pay Ms. Foster any earnest money.

10.  Ms. Foster anticipatorily breached the parties' contract when she unilaterally attempted to cancel it on July 30, 2004 due to the alleged failure of Mr. Kenton to deposit any earnest money.  Ms. Foster's action in signing the cancellation notice on July 30, 2004 (Exhibit 16), and in having Chicago Title Insurance Company send Mr. Kenton the mutual cancellation instructions, already signed by her, for his signature (Exhibit 17) constituted a positive and unequivocal manifestation on her part that she would not render her promised performance when the time fixed for her performance arrived.  Kammert Brothers Enterprises, Inc. v. Tanque Verde Plaza Co., 428 P.2d 678, 683 (Ariz.1967); Esplendido Apartments v. Olsson, 697 P.2d 1105, 1110 (Ariz.App.1984).

11.  Ms. Foster attempted to cancel the parties' contract on July 30, 2004 because she was entering into a real estate sales contract to sell the property to Maureen Sieker for a price that was $130,000 more that the sales price she had agreed to with Mr. Kenton.  The Sieker real estate contract was signed on July 31, 2004.

12.  Mr. Kenton did not agree to the cancellation of the parties' contract, and he subsequently fulfilled his duties under the contract prior to the close of escrow by obtaining a loan commitment for $200,000, by paying the $50,000 deposit, and by paying his closing costs.

13.  Mr. Kenton was ready, willing and able to purchase the property as of the close of escrow.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

14.  Arizona law requires that a plaintiff make an election of remedies at the conclusion of the trial. Edward Greenband Enterprises of Arizona v. Pepper, 538 P.2d 389, 391 (Ariz.1975); Canton v. Monaco Partnership, 753 P.2d 158, 160 (Ariz.App.1987).  Mr. Kenton made an election of remedies at the conclusion of the trial of this action.  Mr. Kenton's purported conditional election of specific performance as his remedy for Ms. Foster's breach of their real estate sales contract was improper and the Court construes it solely as an election of specific performance. *See* Canton, 753 P.2d at 160 ("Once an election [of remedies] has been made with due knowledge of the facts, a party cannot complain if the remedy selected is inadequate.")

15.  Specific performance is ordinarily available to enforce contracts for the sale of real estate because land is viewed as unique and an award of damages is usually considered an inadequate remedy. Queiroz v. Harvey, __ P.3d __, 2008 WL 2058233, at *7 (Ariz.App. May 15, 2008).

16.  The parties' contract, as set forth in Exhibit 3, is sufficient to support a decree of specific performance because the agreement is in writing, is signed by the parties to be charged, and is definite in its terms. LeBaron v. Crismon, 412 P.2d 705, 706 (Ariz.1966); Daley v. Earven, 639 P.2d at 375.

17.  Specific performance is an equitable remedy and is governed by equitable principles. Shreeve v. Greer, 173 P.2d 641, 644 (Ariz.1946).  As such, it is not an appropriate remedy if there is evidence of unfairness, fraud, or overreaching on the part of the purchaser. *Id.*

18. Ms. Foster argues that specific performance is not appropriate in part because Mr. Kenton defrauded her by promising her that he would provide her with a place to live rent-free for the earlier of seven years or until she received her

next installment from the California lottery and that he would advance her funds for living expenses until the close of escrow, but then he repudiated his agreement after she signed the escrow instructions.  The Court rejects this argument because the evidence does not establish the existence of any fraud in the inducement of the parties' contract - while the parties did discuss various proposals prior to the signing of the escrow instructions, Ms. Foster freely entered into the contract knowing that the final terms of the parties' agreement were only those contained within the escrow instructions.  Ms. Foster has not provided any evidence establishing that Mr. Kenton's conduct constituted actionable fraud sufficient to vitiate the contract.

19.  Ms. Foster also argues that specific performance is not appropriate because she and Mr. Kenton believed that no real estate broker's commissions would have to be paid.  The Court rejects this argument.  First, the parties' contract, as set forth in Exhibit 3, does not contain any amount for a broker's commission and it specifically states that the parties entered in the transaction without engaging the services of a real estate broker.  Furthermore, although it was not presented as evidence at trial, the summary judgment record includes a copy of the HUD pre-audit settlement statement, printed out by escrow officer Chatty Larson on July 20, 2004, that shows no real estate broker's commission being owed by either party.  While the record also includes a second HUD pre-audit settlement statement, printed out by Chatty Larson on September 9, 2004, that shows a $15,000 commission being owed to Joanna & Associates Realty and another $15,000 commission being owed to Selman & Associates, neither party has provided any explanation to the Court for the differing settlement statements.  While the parties could have subpoenaed Chatty Larson to testify at

the trial in order to explain the differing forms of the escrow instructions and of the settlement statements, the parties chose not to do so.  Since no such payment is facially included in the escrow instructions forming the parties' contract, the Court concludes that the parties' contract did not include any payment of a real estate broker's commission.

Second, Ms. Foster has not established any mutual mistake because the evidence does not establish that Mr. Kenton ever agreed to pay a real estate commission to anyone or that he agreed that the contract for the sale of the property was in anyway contingent on Ms. Foster not paying a sales commission to anyone.  See Hill-Shafer Partnership v. Chilson Family Trust, 799 P.2d 810, 814 (Ariz.1990) (Under Arizona law, a mutual mistake exists where "there has been a meeting of the minds of the parties, and an agreement is actually entered into, but the agreement in its written form does not express what was really intended by the parties.")

20.  Ms. Foster also argues that specific performance is not appropriate because of inadequate consideration given that the fair market value of the property in July of 2004 was $380,000 whereas the sales price was $250,000. The Court rejects this argument because "under general contract law, mutual promises to buy and sell real estate are sufficient consideration for the contract." Queiroz v. Harvey, __ P.3d __, 2008 WL 2058233, at * 9 fn.3 (Ariz.App. May 15, 2008).

21.  To the extent that Ms. Foster is actually arguing that specific performance should not be granted because the $130,000 difference between the sales price and the fair market value of the property is inequitable and unjust to her, the Court disagrees.  The evidence establishes that prior to entering into the

1    contract Ms. Foster knew that the $250,000 price was below the $312,000
2    appraisal of the property that was obtained in 2000, she then believed that the fair
3    market value of the property was at least $350,000, she knew that no one had
4    offered more than $225,000 to $250,000 for the property after she listed it in
5    March of 2004 for $575,000 due to the damage to the house caused by the
6    backup of the sewer, she has not then living in the house as the house had no
7    working utilities, she was financially destitute, and she was trying to quickly sell
8    the property to forestall imminent foreclosure due to her failure to make mortgage
9    payments.  Under the circumstances established by the record, the sales price
10   agreed to by the parties was not so inequitable or oppressive as to make specific
11   performance inappropriate.

12          22.  Ms. Foster further argues that the contract for the sale of the property
13   is voidable by her because she was induced to enter into it by Mr. Kenton's
14   undue influence on her.  While undue influence may make a contract voidable,
15   *see* Restatement 2d of Contracts, § 177, this rule protects a person only if she "is
16   under the domination of another or is justified, by virtue of [her] relation with
17   another in assuming that the other will not act inconsistently with [her] welfare."
18   Restatement 2d of Contracts, § 177, Comment a.  There is no sufficient evidence
19   of record that Ms. Foster was under Mr. Kenton's domination or that they had the
20   sort of confidential relationship that brings this rule into play.  Furthermore, even if
21   the required domination or relationship were present, the contract would be
22   voidable only if it was induced by unfair persuasion on the part of Mr. Kenton. *Id.*
23   at Comment b.  There is no evidence of record that whatever persuasion that Mr.
24   Kenton used on Ms. Foster regarding their contract seriously impaired the free
25   and competent exercise of her judgment. *Id.*  In addition to the trial evidence
26

- 15 -

1    regarding Ms. Foster's reasons for her willingness to sell the property to Mr.

2    Kenton below its fair market value, the summary judgment record includes Ms.

3    Foster's answers to two of Mr. Kenton's Requests for Admission wherein she

4    admits that she suffered from no mental impairment, incapacity or disability at the

5    time she entered in the contract to sell her house to Mr. Kenton that prevented

6    her from knowing what she was signing or from retaining the services of qualified

7    real estate professionals, and that she could have consulted with a real estate

8    agent or other real estate professional prior to entering into the contract with Mr.

9    Kenton.

10          23.  To the extent that Ms. Foster raises other reasons why the Court

11   should not order that she specifically perform the contract for the sale of the

12   property, the Court finds them to be without merit and rejects them.

13          Therefore,

14          IT IS ORDERED that defendant Linda Foster shall specifically perform the

15   real estate sales contract she entered into with plaintiff Scott Kenton on July 20,

16   2004, as that contract is set forth in the Escrow Instructions (Trial Exhibit 3).

17          IT IS FURTHER ORDERED that plaintiff Scott Kenton shall submit a

18   proposed form of judgment no later than **November 24, 2008.**  The parties'

19   counsel shall personally confer prior to the submission of the proposed judgment

20   regarding the mechanism for implementing the Court's Order, a proposed

21   schedule for that implementation, and the wording of the proposed judgment. If

22   counsel cannot reach an agreement regarding the proposed judgment after

23   reasonable and sincere efforts to do so, defendant Linda Foster shall file her

24   /  /  /

25   /  /  /

26

- 16 -

objection to the plaintiff's proposed judgment no later than **December 5, 2008**.

DATED this 22nd day of October, 2008.

Paul G. Rosenblatt
United States District Judge